IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 3, 2018

IN RE J.T. ET AL.

Appeal from the Juvenile Court for Dickson County
No. 01-17-008-CC   Michael Meise, Judge

_____

No. M2017-01509-COA-R3-PT

_____

In this termination of parental rights case, the Department of Children's Services filed a petition to terminate the parental rights of B.B. (mother) and J.T. (father) with respect to J.T., Jr. and H.T. (the children). The trial court determined that clear and convincing evidence supported two grounds for termination: (1) substantial noncompliance with a permanency plan; and (2) persistence of conditions. By the same quantum of proof, the court determined that termination is in the best interest of the children. We vacate the trial court's judgment with respect to the ground of persistence of conditions. As modified, we affirm the trial court's judgment terminating the parental rights of the parents because termination is supported by clear and convincing evidence of substantial noncompliance with a permanency plan and is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which RICHARD H. DINKINS and KENNY W. ARMSTRONG, JJ., joined.

Jennifer L. Honeycutt, Nashville, Tennessee, for the appellant, B.B.

Steven Hooper, Waverly, Tennessee, for the appellant, J.T.

Herbert H. Slatery III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I.

In 2014, DCS began investigating mother and father after receiving a referral concerning drug-exposed children.[1] During the course of this investigation, both parents submitted to a drug test. Mother tested positive for methadone and oxycodone; father tested positive for cocaine, methadone, and oxycodone. Mother did not have a prescription for pain medication. Father testified that a pain clinic had prescribed him oxycodone for several years due to a severe back injury.

In March 2015, Mother and father stipulated that the children were dependent and neglected as a result of the parents' "unresolved drug issues." Consequently, on March 25, 2015, the trial court entered an order adjudicating the children dependent and neglected. However, at that time, DCS did not attempt to remove the children from the parents' custody because mother and father were seeking assistance and cooperating with DCS.

In the months that followed, mother continued to test positive for oxycodone. Father later tested positive for methamphetamine, oxymorphone, oxycodone, and hydrocodone. On October 1, 2015, the trial court entered an order effective September 30, 2015, giving DCS temporary legal and physical custody of the children. Two weeks later, on October 15, 2015, DCS created a permanency plan, which required parents to: allow DCS to perform a walkthrough of their home; notify DCS of address and phone changes; demonstrate the ability to use alternatives to physical punishment when disciplining the children; complete anger management and domestic violence classes; provide a home that is safe, secure, and free from abuse or neglect; comply with DCS requests for random drug screens by the close of business on the day of DCS's call; attend AA/NA meetings and have attendance sheets signed and turned into DCS monthly; show documentation that they can provide a home for the children and that they can provide for their needs; participate in any recommended family therapy; pay child support; and visit the children as directed by the court. The plan further required father to submit to pill counts and required mother to follow the recommendations of the Bradford A&D program in which she had been enrolled prior to removal.

Subsequent revisions to the permanency plan required parents to complete A&D assessments and follow their recommendations; submit the AA/NA attendance sheets on the first of every month; pass their random drug screens; participate in family therapy; provide letters confirming employment; and submit proof of wages for the last six months. Mother was also instructed to submit to and pass random pill counts and to

---

[1] Mother's interaction with DCS predates the events leading to the current litigation. In addition to J.T., Jr. and H.T., mother has two other children. She surrendered her parental rights to her daughter after allegations of physical abuse. At the time of trial, mother's oldest son was in the custody of his paternal grandfather and mother's visitation was restricted by court order.

continue participating in therapy and medication management. Father was instructed to file for an extension of his unemployment benefits.

Mother and father never fully complied with the terms of the permanency plan, as originally developed or as revised.[2] As a result, their visitation rights were gradually restricted. On January 25, 2017, the trial court suspended parents' visitation rights completely; however, the court stipulated that visitation could resume if both parents tested negative on all random drug screens over the next forty-five days. On the same day, DCS filed a petition to terminate parental rights. After a hearing on the matter, the trial court terminated the parents' rights because it found clear and convincing evidence of substantial noncompliance with the permanency plan and persistence of conditions. In light of the court's findings with respect to mother and father, as well as the court's finding that "the children are in a preadoptive home, doing well, and . . . are bonded with their foster family," the court determined that termination was in the best interest of the children.

## II.

The parents raise the following issues:

> Whether the trial court prematurely terminated parental rights in light of the pending petition for dependency and neglect.

> Whether the trial court erred in finding clear and convincing evidence to terminate parental rights on the ground of persistence of conditions.

> Whether the trial court erred in finding clear and convincing evidence to terminate parental rights on the ground of substantial noncompliance with the permanency plan.

> Whether the trial court erred in finding that clear and convincing evidence supports a finding that the termination of parental rights is in the best interest of the children.

## III.

We first consider mother's argument that the trial court's order terminating parental rights was "premature" because the court never entered a final order resolving DCS's September 23, 2015 "Petition to Adjudicate Dependency and Neglect and

---

[2] We address the extent of their compliance in our analysis below.

Transfer Temporary Legal Custody and Ex Parte Order."

On multiple occasions, this Court has expressly rejected the argument advanced by mother. *See, e.g.*, *In re Donald C.*, No. M2014–01327–COA–R3–PT, 2014 WL 7465684, at \*8 (Tenn. Ct. App., filed Dec. 30, 2014) ("The fact that a custody petition may be pending as part of a different proceeding does not impact the trial court's ability to terminate a parent's rights if termination is warranted under the law and facts of the case."); *In re Alyssa B.*, No. M2011-02698-COA-R3-PT, 2012 WL 3041190, at \*3 (Tenn. Ct. App., filed July 25, 2012) ("The trial court did not err in proceeding to decide the termination action before the dependency and neglect action pending in another court had been concluded."). Each time we have rejected the argument, we have emphasized that "[a] termination of parental rights proceeding is not simply a continuation of a dependent-neglect proceeding. It is a new and separate proceeding involving different goals and remedies, different evidentiary standards, and different avenues for appeal." *In re Alyssa B.*, 2012 WL 3041190, at \*3 (Tenn. Ct. App., filed July 25, 2012) (quoting *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004)). In light of our decisions in the foregoing cases, we conclude that the trial court did not err by terminating parental rights prior to ruling on DCS's petition to adjudicate dependency and neglect.

## IV.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash–Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Because termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Tennessee Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery*

- 5 -

*Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## V.

The trial court determined that clear and convincing evidence supported two grounds for termination: (1) substantial non-compliance with the permanency plan; and (2) persistence of conditions. *See* Tenn. Code Ann. §§ 36-1-113(g)(2)-(3). We address each ground in turn.

## A.

Although the trial court found clear and convincing evidence to terminate parental rights on the ground of persistence of conditions, DCS states in its appellate brief that "[t]he Department will not defend the ground of persistence of conditions, as the record is devoid of an adjudicatory dependency-and-neglect order removing the children from Parents' home." DCS is correct to observe that a final adjudicatory dependency-and-neglect order that removes the children from the parents' home is a prerequisite for terminating parental rights on the ground of persistence of conditions. *See In re Quintin S.*, No. E2016–02150–COA–R3–PT, 2017 WL 2984193, at *16 (Tenn. Ct. App., filed July 13, 2017); *In re Audrey S.*, 182 S.W.3d 838, 872-75 (Tenn. Ct. App. 2005). Because the record contains no such order,[3] we hold that the trial court erred in its determination that clear and convincing evidence supports the ground of persistence of conditions.

## B.

We next address the trial court's determination that clear and convincing evidence supports the ground of substantial non-compliance with the permanency plan. This requires a two-step analysis. First, we ask whether the terms of the permanency plan are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002) (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). Second, we ask whether a "parent's noncompliance is substantial in light of the *degree* of noncompliance and the *importance* of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (emphasis added) (citing *In re Valentine*, 79 S.W.3d at 548-49).

In this case, the trial court determined that the terms of the permanency plan "were reasonably related to remedying the reasons the children were in foster care." Because neither parent challenges this conclusion on appeal, we presume that the plan is both

---

[3] As DCS observes, "[t]he March [25,] 2015 adjudicatory order did not remove the children from Parents. The children remained in Parents' custody until September [30,] 2015, and the record does not contain a subsequent adjudicatory order."

reasonable and related to its remedial purpose.

On the other hand, the parties sharply dispute the trial court's conclusion that mother and father's non-compliance with the permanency plan was substantial. Specifically, the trial court found that:

> [Mother and father] completed a task here and there; [but] they did not complete a majority of the tasks; including providing a safe, stable home; maintain sobriety; submit to pill counts; or participate in therapy.

The court also made specific factual findings with respect to mother and father individually:

> The testimony showed that [mother] was inconsistent as to her mental health appointments, individual therapy, and also that she has not resolved her substance abuse issues. Further, that i[t] has been difficult, especially recently, for DCS to get in contact with [mother].

> As to [father], the testimony showed that he has not submitted to pill counts, attended only a few AA meetings, has not resolved his drug issues, has not shown proof of stable housing, has had little or no contact with [DCS], and has not paid child support.

After our review of the record, we conclude that the evidence preponderates in favor of the facts as found and relied upon by the trial court. Although parents completed anger management, parenting, and domestic violence classes, as conceded by DCS, mother and father did not fully perform the most important tasks required by the permanency plan, namely those tasks relating to the maintenance and proof of sobriety.[4]

For example, mother failed multiple drug screens after the permanency plan was revised to require passage of such screenings. Mother's most recent drug screen was conducted on December 15, 2016; she tested positive for oxycodone. Father also failed multiple drug screens both before and after losing his prescription for oxycodone. Father's most recent drug screen was conducted on January 13, 2017; he tested positive for oxycodone. He also admitted that he only complied with one pill count request during the entirety of this case.

---

[4] At trial, Mr. Guerin, the DCS caseworker, was asked, "If you had to list in order of importance the items that these parents needed to do to get their children back, what would you consider to be the most important?" Mr. Guerin replied, "Addressing their drug issues and dependency."

Mother and father both argue that DCS did not even attempt to administer random drug screens after January 25, 2017. Even if that were true, neither parent disputes the numerous drug screens that each of them failed prior to January 25, 2017. Moreover, father testified that he would test positive for oxycodone on the day of trial. In any event, the trial court clearly credited the testimony of James Guerin, the DCS caseworker, over the testimony of the parents on this issue.[5] Mr. Guerin testified that he and another DCS caseworker made several "diligent search effort[s]" to locate mother and father after their visitation rights were suspended. Specifically, Mr. Guerin testified that they made five trips to parents' home, where they received no response. The caseworkers left business cards at the home and also tried to initiate communication via telephone, without success.

In addition to parents' failure to pass drug screens and to submit to pill counts, mother and father have also substantially failed to attend and complete various drug treatment programs. Mother testified that she only attended AA/NA meetings four or five times per month, despite not having a job. At various times during the trial, father testified that he attended "a few" AA/NA meetings, but he did "not [attend] every week" and at most only attended "once a week." Mr. Guerin testified that parents only "sporadic[ally]" submitted proof of AA/NA attendance, even though the permanency plan required them to do so on the first day of every month. Parents conceded that they failed to consistently report their alleged attendance. Mother was also "unsuccessfully discharged" from one drug treatment program and failed to seek further treatment because of perceived scheduling conflicts and lack of insurance. Father failed complete two A&D assessments despite the fact that DCS assisted him with funding. Father did not attempt to enroll in rehabilitation until after DCS filed a petition to terminate his parental rights.

Parents also substantially failed to attend mental health appointments and therapy sessions. Father admitted that he never began individual or family therapy. Mother testified that she only attended individual therapy twice over a two-month period. Without consulting anyone, mother also stopped taking medication that she was prescribed while in rehabilitation.

Finally, both parents contest the trial court's factual finding that they failed to provide a safe, stable home. Parents testified that they have been renting a home from a friend for over a year and have consistently paid their rent and utilities. Although parents have not provided DCS with official documentation establishing their leasing arrangement, DCS is aware of the location of their home. Mr. Guerin also provided detailed testimony about the contents of the home. According to Mr. Guerin, "[e]xcept

---

[5] Although the court never expressly stated that it found mother and father's testimony less credible than the DCS caseworker's testimony, the court referred to and relied upon the DCS caseworker's testimony in its findings of fact and conclusions of law.

for the [parents'] chemical dependency," the home does not pose any immediate threats to the safety of the children. Whatever weight this testimony might have, it is outweighed by parents' substantial non-compliance with the most important aspects of the permanency plan – the requirements relating to sobriety, proof of sobriety, and mental health treatment.

For the foregoing reasons, we hold that the evidence preponderates in favor of the facts identified and relied upon by the trial court. We agree that this evidence clearly and convincingly supports the ground of substantial non-compliance with the permanency plan.

## VI.

### A.

Because we have found a statutory ground warranting the termination of parental rights, we now focus on whether termination is in the best interest of J.T., Jr. and H.T. We are guided by the following statutory factors as set forth in Tenn. Code Ann. § 36-1-113(i), which provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional,

psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." **State Dep't of Children's Servs. v. B.J.N.**, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing **State Dep't of Children's Servs. v. P.M.T.**, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." **In re Marr**, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing **White v. Moody**, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

**B.**

The trial court stated that it considered all of the factors listed in Tenn. Code Ann. § 36-1-113(i). In concluding that termination was in the best interest of the children, the court specifically relied on the first three factors listed in the statute. First, the court found that mother and father did not make "such an adjustment of circumstance, conduct, or conditions as to make it safe and in the [children's] best interests" to be in their home. Second, and relatedly, the court found that mother and father "failed to effect a lasting adjustment after reasonable efforts by [DCS] . . . ." Finally, the court found that mother and father had not visited the children since their visitation rights were suspended on January 25, 2017, and had "not submitted to random drug screens since that date to

- 10 -

remedy the issue and get visitation reinstated."

In support of these findings, the court recounted mother and father's "long, consistent history of substance abuse, which continues to the date of this hearing." The court emphasized father's admission at trial that he would test positive for oxycodone, for which he no longer had a prescription, as well as father's admission that it "probably would be better [for him] to go to rehab." The court also mentioned mother's inconsistent attendance at mental health and therapy appointments. Further, the court observed that parents repeatedly failed to adjust their behavior with respect to substance abuse despite efforts by DCS to assist them in their rehabilitation. DCS developed permanency plans, funded therapeutic and supervised visitations, assisted with transportation, and helped father complete a TennCare application denial letter in order to provide additional funding for anger management classes and A&D assessments. The court also credited the testimony of a DCS caseworker who stated that DCS made "diligent" efforts to administer random drug screens after visitation rights were suspended.

On appeal, mother and father argue that the trial court erred in concluding that parents failed to make a meaningful adjustment in their circumstance, conduct, or conditions. Specifically, parents recite the limited ways in which they complied with certain aspects of the permanency plan, which, according to them, evidence a material adjustment in circumstance, conduct, and conditions. Although our analysis of grounds and best interest is analytically distinct, we find parents' arguments on this issue unpersuasive for reasons already discussed. The most important parts of the permanency plan, as originally devised and as amended, required parents to remain sober and to consistently submit proof of their sobriety and attempts at attaining sobriety. Release from chemical dependency and proof of remedial actions were the material adjustment in circumstance, conduct, and conditions required by the permanency plan. The evidence clearly and convincingly demonstrates that mother and father did not make the most important lifestyle changes required by the permanency plan.

Parents also argue that they cannot be faulted for failing to visit their children because their visitation rights were officially suspended by the court in January 2017. They acknowledge that they could have regained visitation rights by passing random drug screens, but they again assert that DCS did not even attempt to administer random drug screens after January 25, 2017. However, as we previously noted, Mr. Guerin testified that DCS made "diligent" efforts to locate mother and father after their visitation rights were suspended and before trial. Earlier in this opinion, we resolved this factual dispute in favor of DCS because the trial court credited the testimony of the DCS caseworker, and "where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." ***In re Adoption of S.T.D.***, 2007 WL 3171034, at *4.

The preponderance of the evidence suggests that mother and father failed to effectuate a significant adjustment in circumstance, conduct, or conditions, despite the efforts of DCS to help them achieve that objective. The preponderance of the evidence also suggests that parents failed to take meaningful steps to regain visitation with the children after their visitation rights were suspended. In light of these facts, as well as the fact that the children "are in a preadoptive home, doing well, and . . . are bonded with their foster family," (which parents do not dispute), we hold that clear and convincing evidence exists to support the conclusion that termination is in the best interest of the children.

## VII.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellants, J.T. and B.B. The case is remanded, according to applicable law, for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE